# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| MANDI RENEE JEFFERS, | } |
| Plaintiff, | } |
| v. | } Case No.: 4:16-cv-1747-RDP |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | } |
| Defendant. | } |

## MEMORANDUM OF DECISION

Plaintiff Mandi Renee Jeffers ("Plaintiff" or "Jeffers") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security (the "Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be reversed and remanded under Sentence Four of 42 U.S.C. § 405(g).

**I.     Proceedings Below**

Plaintiff applied for DIB on July 23, 2013, alleging a disability beginning on or about June 30, 2012. (Tr. 79, 135). The Social Security Administration ("SSA") initially denied Plaintiff's application on October 28, 2013. (Tr. 89). Plaintiff then requested a hearing by an Administrative Law Judge. (Tr. 103). Administrative Law Judge Walter V. Lassiter ("the ALJ") heard the case on October 24, 2014 in Montgomery, Alabama. (Tr. 30-75). On May 22, 2015, the ALJ found Plaintiff was not disabled under sections 216(i) and 223(d) of the Act. (Tr. 9-26).

Plaintiff requested review of that decision on July 8, 2015. (Tr. 5). On September 22, 2016, the Appeals Council denied Plaintiff's request. (Tr. 1). The ALJ's decision then became the final decision of the Commissioner and therefore a proper subject of this court's appellate review. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

**II.     Facts**

Plaintiff, age 31 at the time of the hearing, alleges she has been disabled since age 28. (Tr. 25, 135). She completed a cosmetology degree in 2003 while working as a grocery-store cashier. (Tr. 40, 174). She never used her cosmetology degree, however, other than to cut her father's hair every six weeks. (Tr. 62-63).

Plaintiff worked as a telephone operator from 2004 to 2007 and as a packager from 2007 to 2008. (Tr. 24, 40-42, 68-69, 156, 174, 176-78). She graduated with an associate's degree in health-information management in May 2012 while working as a convenience-store cashier. (Tr. 16, 37-39, 68, 174-75). Soon after graduation, on May 10, 2012, Plaintiff suffered a nervous breakdown and was treated for both the breakdown and a migraine headache at Oxford Family Practice. (Tr. 16, 39, 42-43, 260). When, in June 2012, Plaintiff was not paid after returning to work from having been out with her migraine and anxiety, she left her convenience-store job. (Tr. 11, 24, 38-40, 43, 174-175, 192).

After her May 2012 hospitalization, Plaintiff began treatment for anxiety, depression, and migraines. (Tr. 47). She was told that her migraines were caused by her anxiety and depression. (*Id.*). Drs. Anthony Esposito and Chandra Gehi saw and/or treated Plaintiff nine times for migraines and tremors at Anniston Neurology Clinic. (Tr. 20-21, 50, 271-295). Drs. Esposito and Gehi typically reported that Plaintiff was alert, oriented, cooperative, and non-suicidal, with normal judgment and appropriate mood and affect, though they often noted her anxiety and

2

depression. (Tr. 271, 273-74, 279-285, 288-91, 294). Plaintiff last saw them in November 2013 presenting mild tremor and decreasing migraine episodes of one time per month or less. (Tr. 20-21, 269, 270-72).

From May 2013 through August 2014, Dr. Glenn Archibald of Grandview Behavioral Health Centers was Plaintiff's treating physician. (Tr. 211-17, 222-43, 296-304). At his initial assessment on May 6, 2013, Dr. Archibald noted that Plaintiff was well-groomed yet her affect was inappropriate and her mood was anxious and depressed. (Tr. 216). Plaintiff reported losing sleep and hearing voices "for years" with command hallucinations. (Tr. 216-17). Dr. Archibald reported that Plaintiff's "reaction appears geared to impress me with how severely ill she is," and that "all her responses are extreme." (Tr. 217). He diagnosed her with social phobia and noted that she was isolated from everyone, more than she typically was in the past. (*Id.*).

In July, August, and September 2013, treatment notes that are part of the record indicate that Plaintiff continued to struggle with depression, anxiety, hallucinations, and hypersomnia. (Tr. 214-15). In August 2013, Dr. Archibald noted that Plaintiff was "worse," and in September 2013 he noted that her progress was "partial." (Tr. 212-13). In November 2013, progress notes indicate that Plaintiff's symptoms were "much better," affecting her 1-2 times per week, yet the therapist noted that Plaintiff's affect was flat, "behavior lethargic, verbal content shallow, verbal flow severely inhibited, poor eye contact." (Tr. 237). Though Plaintiff had "good days and bad days," the bad days were "severe, a 10 out of 10." (Tr. 236). Plaintiff continued to have social phobia and problems with hearing voices. (*Id.*). In early December 2013 Plaintiff was back to experiencing symptoms 3 to 4 times per week with the therapist noting "flat affect, low mood, poor eye contact, lethargic, regressed verbal behavior." (Tr. 235). Later in December Plaintiff's symptoms were rated as "much better" at 1-2 times per week but Dr. Archibald noted that

3

Plaintiff "had a panic attack at the mall (crowded)." (Tr. 234).

Therapy notes from 2014 continued to track the ups and downs of Plaintiff's treatment, with notes in late March and early April 2014 stating Plaintiff was "functioning at her peak level" with severe symptoms 1-4 times per week. (Tr. 228-29). Other notes from 2014 have Plaintiff experiencing symptoms nearly every day with flat affect and continued auditory hallucinations (Tr. 232), hypersomnia (Tr. 227, 231), crying all of the time with symptoms every day and "really bad depressed" (Tr. 230), depressed mood, poor eye contact, lethargic behavior, and scarcity of verbal elaboration (Tr. 226), and sleeping all day and inactivity (Tr. 225). The final recorded visit in August 2014 indicates that Plaintiff enjoyed a trip to Gulf Shores and that her medications were helping, except for the side effect of sleepiness during the day.[1] (Tr. 19, 225).

Dr. Archibald completed a Mental Residual Functional Capacity Assessment ("MRFC") on October 23, 2014 concluding:

> Plaintiff constantly exhibits a baseline of severe impairment due to mental illness. Her symptoms are severe enough to be readily observable by non-professionals. . . . [S]he is isolative and significantly uncomfortable in any social situation. . . . This patient is completely incapable of working and struggles with personal hygiene and minimal self-maintenance.

(Tr. 21-22, 304).

While seeing Dr. Archibald for mental health, Plaintiff also saw cardiologist Dr. Osita Onyekwere for physical health. (Tr. 22-23, 306-15). Plaintiff complained, in June 2014, of "palpitations, leg and ankle swelling, and fatigue." (Tr. 22, 312). Noting Plaintiff's "[p]oorly balanced diet," Dr. Onyekwere prescribed additional medications and encouraged her to improve her diet. (Tr. 314). Dr. Onyekwere reported at every visit between June and October 2014 that

---

[1] Plaintiff did complete sleep EEGs on May 14, 2012, June 4, 2012, and January 14, 2013. (Tr. 277). Overall, those reports were found to be normal, as was an MRI of her brain. (Tr. 277, 290).

Patient was alert, oriented to time, place, and person, and had appropriate mood and affect. (Tr. 305-15). Plaintiff also saw physician Dr. Hopper for various minor physical ailments during this period. (Tr. 20, 264-65). Dr. Hopper noted Plaintiff's diagnosis of schizophrenia. (Tr. 20, 266).

Psychologist Dr. June Nichols, the consulting clinical psychologist for the Commissioner, evaluated Plaintiff's mental health on September 28, 2013. (Tr. 77, 218-21). Plaintiff "drove to the appointment and arrived on time." (Tr. 17, 219). Diagnosing Plaintiff with "panic disorder with agoraphobia," "schizoaffective disorder," and "schzotypical [sic] personality disorder," Dr. Nichols concluded that Plaintiff's "level of anxiety would likely interfere with job performance." (Tr. 17, 221). Dr. Nichols assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60, at the upper end of the "moderate limitation" range.[2] (Tr. 17-18, 82, 221).

Plaintiff testified that she now experiences migraine headaches only about once every six months. (Tr. 50). She has been prescribed various medications for her depression and anxiety which make her drowsy, lethargic, and "unable to function." (Tr. 47). The medications have also caused her to gain a hundred pounds over the last two years. (Tr. 47-48).

Plaintiff testified that she cannot be in crowds because she "get[s] sick as a dog." (Tr. 51). She describes her panic attacks as "sweat pouring, heart racing, pounding, can't breathe good, feel like I'm going to pass out." (*Id.*). Despite her medications, her depression occurs "about every day," she cries "every day," and has suicidal thoughts. (Tr. 51, 53). She sees things and hears voices, and talks to people that are not there. (Tr. 52). She gets irritable with others and says little things set her off. (Tr. 53). She is not able to get herself up and dressed and ready for the day six out of seven days of the week. (Tr. 53-55). In fact, Plaintiff has cut off all of her hair

---

[2] At least one judge in this court has looked to an Eleventh Circuit decision and concluded that an ALJ is not required to rely on a GAF score. *But see Sanders v. Astrue*, 974 F.Supp.2d 1316, 1320 (N.D. Ala. 2013) (citing *Luterman v. Commissioner of Social Security*, 518 Fed. App'x 683, 690 (11th Cir. 2013)).

because she doesn't like taking care of it. (Tr. 55). Once a month, Plaintiff drives six miles for an after-hours haircut at a friend's salon. (Tr. 55-56, 60-63).

Plaintiff currently lives with her parents and grandmother. (Tr. 16, 48-49, 62-63). Although Plaintiff's grandmother can care for herself, as a matter of courtesy Plaintiff fixes her grandmother breakfast and lunch. (Tr. 48-49). Plaintiff testified that she belonged to a dating website until recently, but was largely inactive on the site. (Tr. 66-67).

## II. ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Here, however, Plaintiff has not engaged in SGA since the alleged onset date June 30, 2012. (Tr. 11, 38-39, 137-49, 171-81).

Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Here, the ALJ found that Plaintiff has the following combination of severe impairments:

> history of mitral valve prolapse; obesity, with noncompliance, without any mental or physical obstacle preventing compliance; possible panic disorder with agoraphobia; possible schizoaffective disorder; possible schizotypal personality disorder; history of migraines; history of anxiety disorder with shakiness— shakiness/hand tremors resolved; history of common migraine headaches; history of headaches; and edema, lower extremities [20 C.F.R. § 404.1520(c)].

6

(Tr. 11, 13, 79-84, 268-95).

Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. See 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a Listing. (Tr. 14).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). At this step, the ALJ gave "little weight" to the medical opinions of both of Dr. Archibald and Dr. Nichols, and found some of Plaintiff's statements "not entirely credible." (Tr. 17, 22). The ALJ ruled that Plaintiff has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), except that Plaintiff:

> cannot perform work activity that requires her response to rapid and/or frequent multiple demands. Changes in her work activity and/or work setting must be infrequent and gradually introduced. [Plaintiff] can respond appropriately to supervision as well as perform work that requires only occasional supervision . . . [and] can frequently interact with coworkers so long as not in large groups and interaction is casual. [Plaintiff] can respond appropriately to the public; however, she is better suited for work activity that does not require interaction with the public.

(Tr. 14-24, 69-70).

Next, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing

7

past relevant work, then the claimant is deemed not disabled. *Id.* The ALJ found that Plaintiff's RFC would still allow her to perform past relevant work as a packager. (Tr. 24).

Alternatively, if the ALJ finds the claimant is *unable* to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this last part of the analysis, if the claimant cannot perform past relevant work, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c). Though the ALJ found Plaintiff capable of past relevant work, the ALJ nevertheless alternatively found that Plaintiff could perform other jobs existing in the national economy. (Tr. 24-26). Either finding would properly allow the ALJ to deem Plaintiff not disabled. 20 C.F.R. § 404.1520(a)(4)(iv), (f)-(g).

### III. Plaintiff's Argument for Reversal or Remand

Plaintiff seeks reconsideration of the decision to deny disability benefits arguing that: (1) the ALJ failed to accord proper weight to both the treating physician and the consulting physician; (2) the ALJ failed to consider Plaintiff's testimony regarding the side effects of pain medication; and (3) the ALJ did not have substantial evidence to support the finding that Plaintiff can perform past work. (*See generally* Pl.'s Mem., Doc. #11). Because the first issue is sufficient to require a remand, this opinion does not address Plaintiff's second and third arguments for remand or reversal.

### IV. Standard of Review

The only issues before this court are whether the record reveals substantial evidence to

sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V. Discussion

The court's task is limited here to a determination of whether the ALJ properly weighted the opinions of the treating and consulting physicians. (Pl. Br. at 15-24). Both physicians agreed as to the claimant's daily limitations related to her diagnoses of depression and anxiety. (Tr. 212-34; 304). Yet, the ALJ rejected both of those opinions, finding instead that "the [treating] doctor gave an opinion relying more on the claimant's subjective complaints instead of his own

9

and other's objective evidence" and that "[the consulting examiner] opinion is not consistent with the GAF score she assessed and not consistent with her observations." (Tr. 17, 22).

An ALJ's weighting of a medical source's opinion depends on three factors: (1) the medical source's relationship with the claimant, (2) the evidence the medical source presents to support his opinion, and (3) the degree of consistency between the medical source's opinion with the medical evidence in the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c)(2). Under the "treating physician rule," a treating physician's opinion is entitled to substantial weight unless good cause is shown to the contrary. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Good cause exists when: (1) the opinion is not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records. *Crawford v. Comm'r*, 363 F.3d 1155, 1159-60 (2004); *Winschel v. Comm'r*, 631 F.3d 1176, 1179 (11th Cir. 2011). The opinion of a consulting examiner cannot be given greater weight than that of a treating physician. *Hillsman v. Bowen,* 804 F.2d 1179, 1181-82 (11th Cir. 1986).

As the treating physician, Dr. Archibald completed a Mental Residual Functional Capacity Assessment ("MRFCA") on October 23, 2014, twelve months after the onset of Plaintiff's condition. (Tr. 302-04). Before reaching his conclusion, Dr. Archibald rated Plaintiff as markedly limited in 3 of 4 categories related to understanding and memory, 7 of 8 categories related to sustained concentration and persistence, 4 of 5 categories related to social interaction, and 4 of 4 categories related to adaptation. (Tr. 302-03). Dr. Archibald concluded that Plaintiff "constantly exhibits a baseline of severe impairment due to mental illness. Her symptoms are severe enough to be readily observable to non-professionals. She is socially isolative and quite vulnerable." (Tr. 22, 299, 304). The ALJ gave this opinion little weight, however, finding only

that the doctor "rel[ied] more on the claimant's subjective complaints instead of his own and other's objective evidence." (Tr. 22). Substantial evidence in the record simply does not support that finding.

To be sure, Dr. Archibald and his staff sometimes expressed optimism for Plaintiff's condition. (Tr. 228-29). But notes of Plaintiff's improvement were just as often interspersed with notes of Plaintiff's decline. Some symptoms responded to medication (Tr. 229, 231, 238-43), while other symptoms worsened (Tr. 225). Plaintiff started having auditory hallucinations (Tr. 232), and stopped exercising (Tr. 225). This objective medical evidence does not counter Dr. Archibald's opinion in the MRFCA, and no other good cause has been stated by the ALJ for affording the opinion of Dr. Archibald little weight. *See Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (reversing a decision in which the ALJ rejected uncontradicted opinions from two examining physicians finding that claimant was totally disabled). Moreover, to the extent Dr. Archibald relied on Plaintiff's subjective complaints, he was entitled to do so, and doing so "hardly undermines [his] opinion as to [the patient's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." *Hall v. Astrue*, 2011 WL 4635028 at *15 (N.D. Fla. Aug. 31, 2011) (internal citations omitted).

Even more telling is that Dr. Nichols, the consulting physician for the Commissioner, agreed with Dr. Archibald that Plaintiff's "level of anxiety would likely interfere with job performance."[3] (Tr. 17, 221). Nevertheless, the ALJ affords the opinion of Dr. Nichols little weight because "her opinion is not consistent with the GAF score she assessed and not consistent with her observations." (Tr. 17). But the ALJ's "finding in this regard is based on a highly

---

[3] Dr. Nichols assigned Plaintiff a GAF score of 60, indicating moderate limitation. (Tr. 17-18, 221). While the GAF score alone indicates that Plaintiff should be able to perform some work, as a whole the assigned GAF score is inconsistent with Dr. Nichols' other findings. *See Chillous v. Hill*, 2017 WL 1237977 at *6 (N.D. Ala. Mar. 31, 2017).

11

selective review of the record." *See Burroughs v. Massanari*, 156 F.Supp.2d 1350, 1364 (N.D. Ga. 2001). The ALJ relied on his own interpretation of Plaintiff's testimony regarding her activities instead of the testimony itself and the opinions of the doctors.[4]

Because the ALJ did not afford proper weight to the opinions of Drs. Archibald and Nichols and because the record indicates the ALJ substituted his judgment for that of the medical experts, the Commissioner's decision is due to be reversed and remanded. *See Gulsby v. Barnhart*, 430 F.Supp.2d 1251, 1253 (S.D. Ala. 2005) (reversing an ALJ's denial of benefits for "[e]ssentially . . . reject[ing] all of these [medical] opinions or conclusions though they collectively lead to the conclusion that [the p]laintiff has a severe mental impairment"); *Freeman v. Schweiker*, 681 F.2d 727 (11th Cir. 1982) ("[T]he ALJ engaged in what has been condemned as 'sit and squirm' jurisprudence. In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant fails short of the index, the claim is denied.").

## VI. Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence and the proper legal standards were not applied in reaching

---

[4] For example, Plaintiff's testimony about the circumstances of her haircuts support Dr. Nichols's diagnosis of agoraphobia. (Tr. 60-63, 67-68). Plaintiff drives alone to the shop of a long-time friend "after work and [they]'re the only two people in her shop." (Tr. 62). Plaintiff, consonant with agoraphobia, "waits until the facility is empty of any other customers." (Tr. 17). Puzzlingly, the ALJ says that Plaintiff goes "once a week or month" even though Plaintiff testified unequivocally that she goes "[o]nce a month." (*Cf.* Tr. 22, *with* Tr. 62). It is inappropriate for the ALJ to embellish the record. *See Burroughs*, 156 F.Supp.2d at 1363.

Neither is Plaintiff's online-dating account inconsistent with Dr. Nichols's diagnoses of agoraphobia and schizoaffective disorder. (Tr. 66-67, 221). At the hearing, Plaintiff tried to testify that the account was old, from "before [Plaintiff] got sick," and that she "didn't use it." (Tr. 67). But the ALJ would not hear it. (*Id.* ("That's neither here nor there.")). The ALJ created any inconsistency by interrupting and ignoring Plaintiff's testimony that the period of her disability did not coincide with use of the account. (*Id.*). And the ALJ went beyond any testimony to hypothesize that Plaintiff "maneuver[s] through the dating website answering questions, talking with potential suitors, and organizing and/or going out on dates." (Tr. 23). Nothing in the record supports those assertions (Tr. 66-67), and once again, it is inappropriate for the ALJ to embellish the record. *See Burroughs*, 156 F.Supp.2d at 1363; *see also Mills v. Astrue*, 226 F. App'x 926, 926 (11th Cir. 2007) (requiring substantial evidence of opinion's inconsistency with the record).

this determination. The Commissioner's final decision is therefore due to be reversed and remanded. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this August 23, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE